UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
     - v. -                               :
                                          :
TONE N. GRANT                             :
                                          :
                    Defendant.            :
                                          :
------------------------------------------x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/16/08

**MEMORANDUM AND ORDER**

S4 05 Cr. 1192

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Tone Grant, who was convicted on April 17, 2008 of conspiracy to commit securities fraud, bank fraud, wire fraud and money laundering and the substantive crimes that were the objects of the conspiracy, and sentenced principally to a term of imprisonment of ten years, has filed a Motion for Bail Pending Appeal dated August 21, 2008. The defendant and the government are in agreement about the legal standard applicable to such a motion. In relevant part, Title 18, United States Code, Section 3143 provides that a defendant sentenced to a term of imprisonment shall be detained unless the Court finds by clear and convincing evidence that the defendant does not pose a flight risk and that his appeal is "not for the purpose of delay and raises a substantial question of law or fact likely to result in (i) reversal, (ii) an order for a new trial . . . ." 18 U.S.C. § 3143(b). A substantial question is "one of more substance than would be necessary to a finding that it was not frivolous. It is

1

a 'close' question or one that very well could be decided the other way." United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985). If a substantial question is found, the Court must look to whether the issue is "so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial." Id. The defendant has the burden of persuasion with respect to Section 3143(b). Id.

Here, there is no disagreement that Grant does not pose a flight risk. However, this Court concludes that neither of the issues Grant raises in his motion are the kind of close, substantial questions that warrant bail pending appeal. Further, assuming, arguendo, that the issues Grant raises were such questions, neither are so "integral to the merits of the conviction" as to require reversal or a new trial.

## BACKGROUND

The indictment resulted from the defendants'[1] actions in hiding the true state of Refco, Inc.'s ("Refco")[2] finances while: (1) securing lines of credit for Refco; (2) privately selling notes prior to 2004; (3) selling 57% of Refco to Thomas H. Lee

---

[1] Phillip R. Bennett ("Bennett"), Refco's CEO and part-owner of Refco Group Holdings, Inc. ("RGHI") and Robert J. Trosten, Refco's CFO from 2001 to 2004 were indicted along with Grant. Both pled guilty before trial and Trosten became a cooperating witness.

[2] Refco was a commodities, securities and futures brokerage and clearing firm.

Partners ("Lee") in 2004 for $510 million; (4) selling approximately $600 million of notes to the public in 2004; (5) obtaining approximately $800 million in bank financing in 2004; and (6) raising $583 million through an initial public offering ("IPO") in August of 2005. In total, Refco defrauded investors and the public of $2.4 billion. Shortly after the IPO newly hired in-house accounting personnel discovered the true state of Refco's finances (namely, that it was not solvent and indeed had not been so since 1997), Refco filed for bankruptcy on October 17, 2005.

Grant was President of Refco from 1997 to 1998 and was part owner of RGHI which had an ownership interest in Refco. Grant's initial ownership interest in RGHI was 24.5%, which was later increased to 50%. Preceding the Lee transaction Grant's ownership in RGHI was 50% with Bennett owning the other 50%. RGHI was the corporate entity used to hide Refco's debt.

Viewed favorably to the government, as the jury's verdict of guilty on all counts requires, the government's evidence established inter alia that Grant: (1) knew of and assisted in covering trading losses exceeding $90 million incurred by the trading of a customer, Victor Niederhoffer; (2) was present at a meeting with Steven Rossi, Refco's comptroller, in February 1999 during which the accounting mechanisms to hide Refco's debt (including the round-trip transactions), and the extent of that

3

debt (approximately $900 million) were graphically explained; (3) agreed to relinquish his ownership interest in RGHI which was a precondition to the Lee transaction for an immediate cash payment of $16 million ($4 million plus $12 million) and the potential of $275 million from Bennett's sale of stock from the anticipated IPO; and (4) lied about whether Refco was engaged in propriety trading.

Grant's defense was not that there was no fraud, but rather that he too was lied to by Bennett and that he, Grant, lacked the requisite intent required for conviction. Specifically, Grant sought to present a "consciousness of innocence" defense, the centerpiece of which was his production through his prior lawyers of two pages of handwritten notes (GX 8047) taken by Grant during a meeting with Bennett at which Bennett sought Grant's consent to a sale of Grant's interest in RGHI which was a pre-condition to the Lee leveraged buyout transaction ("LBO"). Those notes reflected that the "real debt" of Refco was $1.1 Billion and that "real net debt" of $264 million would remain even after the LBO closed. Thereafter, Grant agreed to sell his interest in RGHI and signed deal documents which reflected no debt from RGHI to Refco. Grant maintained that a person who took the notes, maintained the notes, produced them to his lawyer and to the SEC did not believe he had committed a crime.

## Discussion

### Consciousness of Innocence

The issue of whether Grant could support a "consciousness of innocence" defense by introducing the testimony of his prior attorneys, while carefully circumscribing that testimony and any waiver of the attorney-client privilege, was the subject of extended and extensive motion practice, oral argument, and rulings before trial.[3]

The issue was initially presented in the context of a motion by Grant to sever his case from his then co-defendants. Oral argument on that motion was held on April 23, 2007 and the motion was decided by written decision on May 3, 2007. For the ease of any reviewing court we quote from that opinion:

> Grant argues that this consciousness of innocence evidence is essential for him to "demonstrate the fundamental implausibility that he acted with criminal intent," Mem. Supp. at 19, because "a guilty person would not have turned these over to the government knowing that the government could easily prove the existence of a conspiracy." Tr. at 14. However, at oral argument, counsel for Grant acknowledged that Grant's then-counsel had knowledge and possession of the notes in question before they were turned

---

[3] It became clear early on that it was unlikely that Grant would himself take the stand. In that regard, this Court observed, "I have not particularly focused on this scenario of Mr. Grant taking the stand essentially because if that was what you wanted to do, in fact, you wouldn't be struggling as much with the proffer approach, you wouldn't have to. . . . but certainly I start with the proposition that any defendant charged in any case should be able to get on the stand and say I didn't do it or whatever it is that that he kind of wants to say with a minimum of interference from the Court." (Tr. March 18, 2008 at 43/25-44/9.)

5

over to the government in August 2006 pursuant to the SEC subpoena. Id. at 10. As such, as this Court observed at oral argument, Grant's "choice" in turning the notes over "evaporates when once the lawyers have them" because "they cannot participate in an obstruction of justice by permitting him at that point to destroy the notes or not turn them over." Id. at 15.

Grant is thus left to argue that "before he even turned [the notes] over to his own lawyers [he] had read the indictment, and had discussions, and had read the newspaper articles about Mr. Bennett's bail argument"-that is to say, the fact that Grant turned over these notes to his lawyers is evidence of consciousness of innocence. Id. at 16. We are not persuaded by this argument. Grant might well have turned over these notes-contained in a few boxes of disclosures, see Id. at 13 -- to his counsel not knowing "how the government would read these notes," Id. at 7, or not fully comprehending that the disclosure of his notes to his lawyers would result in their production if a subpoena was issued at a later date.

Thus, though we explicitly reserve an evidentiary ruling on this matter for a more appropriate time, we find it sufficient for our purposes here to state that we believe that Grant would not be prejudiced in advancing this defense if he is able to argue that: (1) he knew that Bennett had been arrested and indicted; (2) he knew of, and had read, the "lengthy" indictment against Bennett; and (3) the charges against Bennett were serious. We fail to see the relevance either of Bennett's bail conditions -- Bennett, after all, is not a citizen of the United States -- or of Grant's purported conversations with his then-counsel regarding the indictment against Bennett.

Moreover, evidence of Grant's state of mind before he turned over these notes would necessitate his testimony, and defense counsel candidly stated at oral argument that they "can't provide any assurances" as to whether Grant will testify. Id. at 10. We are unwilling to construct any justification to sever on so shaky a

6

foundation.

United States v. Bennett, 485 F.Supp.2d 508, 513-14 (S.D.N.Y. 2007).

The "consciousness of innocence" --lack of intent-- defense as related to the taking, preservation, and production of the notes was also the subject of an in limine motion, styled, "Motion in Limine Regarding Scope of Defense Case." Our March 11, 2008 Order, while finding the application unpersuasive, invited Grant to submit an offer of proof. Again, for the ease of any reviewing court, we quote:

> More particularly, Grant seeks to introduce testimony either from his prior lawyers or himself setting forth a timeline of the production of Grant's handwritten notes of a meeting with Phillip Bennett at the Marriott Hotel on May 17, 2004 (the "notes") to the Securities and Exchange Commission ("SEC") following the issuance of a subpoena by the SEC to Grant on June 22, 2006. Grant maintains that his timeline would support his argument that an individual who took the notes, maintained the notes and produced the notes did not believe he had committed a crime. Having carefully reviewed Grant's motion papers, we are not persuaded that Grant has met his initial burden of demonstrating the relevance of the proffered evidence as there are any number of reasonable scenarios that account for the production of the notes that are inconsistent with Grant's theory of innocence. Thus, applying a Rule 403 balancing analysis, the probative value (if any) of the proffer is substantially outweighed by confusion of the issues resulting from the necessity of a trial within a trial to address the alternative explanations. However, we are receptive to receiving an offer of proof of the actual testimony (not simply its subject

7

matter) that Grant seeks to introduce. From such
a detailed offer of proof, we will be better able
to evaluate the proffer and the scope of the
waiver of the attorney-client privilege resulting
therefrom. Finally, we note that Grant should be
able in the course of the trial to establish, even
without calling the witnesses that are mentioned
in this motion, much, if not all, of the timeline
he seeks to establish.

Memorandum and Order dated March 11, 2008 at 2.

Following that decision, Grant did submit an offer of

proof by a document entitled a "Proffer of Proposed Evidence to

be Offered by Tone Grant in his Defense."[4]   Once again, oral

argument was held on Grant's evidentiary application.   After

hearing argument, this court ruled on the record.   Once again, we

reproduce that ruling:

> We have talked for a long time and let me
> give you a ruling on the motion and let us start
> with where we were earlier, which is the sequence
> of events will essentially come out during the
> trial and certainly I cannot say that every aspect
> of the sequence will, but I think in large part
> the sequence of events will come out.   So the

---

[4] Grant sought a ruling that any waiver of the attorney-client privilege "be a
limited waiver extending only to the specific subject matter introduced by Mr.
Grant. . . ."  Motion in Limine Regarding Scope of Defense Case at 4.  More
specifically Grant maintained:

> The subject matter placed at issue by Mr. Grant related only
> to verifiable temporal facts related to the production of
> these notes. Mr. Grant does not intend to introduce
> evidence regarding the substance of his discussions
> regarding the meaning of the notes with his attorneys, nor
> of any other substantive discussion between Mr. Grant and
> his attorneys. Therefore, the government should not be
> permitted to inquire into the substance of Mr. Grant's
> discussions with his attorneys on other subjects, including
> the content of the notes or the document production.

Id. at 11-12 (footnote omitted).

8

issue really is how much flesh is to be added to so the bones of the sequence of events.

I think that the proffered evidence to the extent that it doesn't simply include inadmissible hearsay has limited probative value within the meaning of 401, which is relevant evidence, evidence having any tendency to make th existence of a fact more probable than not.

However, I would find the probative value to be very slight, and that is for a number of reasons. First as we talked about earlier this evidence doesn't fall within the case law admitting consciousness of innocence evidence. This is not so clear that we are into the jump-at-a-chance category and that is for number of reasons. The first is something that we talked about earlier and that is that there are numerous alternative explanations of merit.

First is simply that there was no choice, that there is a duty to retain documents once you've been sued and Mr. Grant had been sued. There is also the issue that the lawyers had no ethical choice. There is also the possibility that the documents were turned over because their significance was not appreciated and the consequences of the production may not be appreciated in that context of possibility that the government had focused on Mr. Bennett and was not interested in Mr. Grant. There is a variation on that theme.

There is the alternative explanation that the production is absolutely deliberate and was to demonstrate to the SEC that Mr. Grant would be a fine witness against Mr. Bennett. And the other alternative explanation is that there were other reasons to preserve the notes, positive reasons, that as noted earlier they provided a basis for Mr. Grant to testify against Mr. Bennett.

They are protection for Mr. Grant in a business sense. They are protection for Mr. Grant if it turns out that Mr. Bennett decides to cooperate. And one also shouldn't forget that Mr. Bennett knew that he took the notes. So again, if Mr. Bennett was cooperating, he would be in a position to say that Mr. Grant had destroyed the notes as they weren't produced.

9

There are other reasons that this evidence has limited probative value. First of all, the theory offered by the defendant is inconsistent with the property transfers that were done at approximately the same time. There is the fact that there was a request to return them.

The sort of consciousness of innocence defense is really contradicted by two other arguments that the defendants have made. One is that the notes are not really helpful on the issue that the trial involves, simply what did Lee, Thomas H. Lee know or not know. Secondly, the argument that was made this morning that they are inherently ambiguous. If the are inherently ambiguous, turning them over is in a sense no big deal.

Given my view that they are such limited probative value, we then turn to the 403 analysis and here my concern is that raising these -- having the Hannafans testify as to material offered in the proffer raises a host of other issues such as did his lawyers have an ethical obligation to produce the documents, what were his conversations with the lawyers, did they discuss the Fifth Amendment, did they discuss ethical issues, and did they discuss the meaning of the notes.

We get into the other litigations that Mr. Grant was named in, his obligations to retain documents, and his failure to a produce these notes in other civil litigations. We get into all the relevant considerations that we've talked about somewhat of destroying them versus producing them. Finally, we get into the privilege issue of inadvertent waiver, issues perhaps relating to his representation.

Doing that 403 balance analysis this would truly be a trial within a trial and given the very limited probative value, I am not going to permit the testimony that has been proffered by the defense in the proffer that was served on March 14th.

\*       \*       \*       \*       \*

10

[W]ell, I don't think that the defendants have come within the _Biaggi_ case[5], but at the same time I would be reluctant to preclude them at least on summation from arguing from the evidence at trial that certain inferences can be drawn from that and one inference would be that someone who thought he was guilty wouldn't have acted this way. My assumption was that they would argue something like that on their summation and the government would then have facts or be able to argue the contrary inferences. There certainly would be no charge on consciousness of innocence because I don't think they have met the legal standard; but as a simple matter of inference, I would like [sic] them argue.

Transcript of Conference Held on March 18, 2008 ("Mar. 18, 2008 Tr.") at 44/22-47-23; 49/9-20. Decision was reserved on whether evidence of subsequent counsel's effort to "clawback" the notes on the basis that they were inadvertently produced could be introduced by the government. A letter ruling followed the next morning, March 19, which concluded that no reference should be made to the letter as it was irrelevant to Grant's state of mind at the time the notes were created, retained or produced. Additionally, it was noted that the letter raised Rule 403 issues akin to the ones arising from Grant's proffer.

---

[5]Although Grant argues that the _Biaggi_ case is analogous, the facts of this case simply do not fall within it. In _Biaggi_, the defendant sought to include evidence that he rejected an offer of immunity. Grant's production of the notes do not imply a lack of "guilty knowledge" in the same way as an offer to "preclude all exposure to conviction and its consequences." United States v. Biaggi, 909 F.2d 662, 690 (2d Cir. 1990). As noted in _Biaggi_, where the rejection of an offer of immunity is "probative of a state of mind devoid of guilty knowledge," there may be many reasons for rejecting a plea offer that are consistant with guilty knowledge. _Id._ Similarly, as we have noted, there are many reasons for the production of Grant's notes that are consistent with guilty knowledge. Thus, _Biaggi_ is not controlling here.

11

Several observations about how this issue actually played out at trial are in order to complete the record. First, the evidence proposed in Grant's formal proffer other than the inadmissable hearsay actually became part of the trial record which leads to the second observation: Grant's counsel had a full opportunity to advocate his "consciousness of innocence defense" and did so in his summation:

> Now, Mr. Zuckerman will talk to you a little bit more about the Lee deal in his part of the defense closing, but I do want to briefly address the meeting that Tone Grant had with Phil Bennett in May 2004. Because while Mr. Bennet's spewed numbers at tone, Tone took notes. Just like Earl Melamed at his meeting with Bennett, Tone Grant took notes and tried to follow the numbers. And then after the meeting, Tone Grant preserved these notes, kept them in a file, and in 2006 produced them to the government. That's why you have the notes with you today.
>
> Those are the notes. It's got a bunch of numbers, a bunch of words on them, but you know what the most important characters on these notes are? SEC/TNG. Because that means that this man, the one that the government wants you to think I senganged in a gigantic fraud with Phil Bennett, made notes of this private conspiratorial conversation and that he saved these notes and turned them over to the same federal government that was already prosecuting Phillip Bennett.
>
> MR. GARCIA: Objection.
>
> THE COURT: Go on.
>
> MR. GOELMAN: Remember what both Mr. Zuckerman and Mr. Barofsky said in their opening statements. Use your common sense, your knowledge about the way people act in the real world. Well, here on earth, criminal masterminds do not make a record of their private conspiratorial conversations. And if they do, they certainly don't carefully save them. And if they do that, they certainly don't turn them over to the authorities. And make

no mistake, that is exactly what Tone Grant did here.

He got a SEC subpoena on June 26, 2006. Tone Grant, care of Michael Hannafan. And this SEC subpoena gave Mr. Grant certain information. It says, "If you want to know what the commission is going to do with these materials, go to the list of routine uses of information. This form has other important information for you. Please read it carefully."

What does the SEC form say? "Routine uses of information. The commission often makes its files available to other governmental agencies, particularly United States attorneys and state prosecutors. There is a likelihood that information supplied by you will be made available to such agencies where appropriate."

"Routine uses. Coordinate law enforcement activities between the SEC and other federal, state, local or foreign law enforcement agencies."

Sent to the same lawyer who represented Tone Grant in October 2005. The same lawyer who in October 2005 told Tone Grant that Sandy Maggio was cooperating with the government.

"10/28/05. Conference with client re October 28 Wall Street Journal article regarding Maggio Statement to investigators."

So when Tone grant gives these notes to the SEC, he knows a couple of things. He knows that the SEC is going to share them with the U.S. Attorney's Office. He knows that the U.S. Attorney's Office is already prosecuting Bennett for crimes that could leave him locked up for the rest of his life. And he knows that Sandy Maggio is cooperating with the U.S. Attorney's Office.

So why did Tone Grant give these notes and all the other documents that you have that ahs that SEC/TNG stamp on the bottom to the government in 2006? The answer is Tone Grant turned over those notes for the same reason he made them in the first place. He turned them over for the same reason he didn't shred them or swallow when he walked out of the meeting with Bennett, for the same reason he carefully preserved them. He turned them over because Tone Grant didn't think these notes were incriminating, because Tone Grant didn't think he was engaged in a crime.

13

Well, the government says it turns out he's wrong. They are incriminating. He was engaged in a crime. It doesn't work that way. The crimes that Tone Grant is charged with, each of the five crimes, is a specific intent crime. Each of them requires proof beyond a reasonable doubt that Tone Grant acted with criminal intent, intent to defraud. That means if Mr. Grant didn't believe he was engaged in a fraud, if he didn't believe he was committing a crime, then he wasn't. And who on earth, who realizes that he is engaged in a massive fraud, fraud punishable by life in a federal prison --

MR. GARCIA: Objection.

MR. GOELMAN: -- is going to turn these notes over to the same government that is prosecuting his partner?

*     *     *     *     *

And if Tone Grant were guilty of what the government says he is and his partner in crime were just arrested and charged with these crimes, what would Mr. Grant have done? Go to his files, make sure any incriminating documents were destroyed? Get his passport? Book a flight to Vienna, the way you heard Phil Bennett was doing?

What does he do? He preserves his documents. And then when the federal government, the same government that is prosecuting Phil Bennett, asks for them, he produces them.

Trial Transcript ("Tr.") at 2857/17-2860/22; 2896/2-10.

Finally, Grant was able to advocate his "consciousness of innocence" argument while avoiding the introduction of two pieces of evidence which would have dramatically undercut that argument. First, as noted earlier, having ruled that Grant could not introduce his proferred evidence by calling his former counsel (at least without a greater subject matter waiver of the attorney-client privilege which he was unwilling to do), this

14

Court did not for similar relevance and Rule 403 balancing reasons allow the government to introduce evidence that Grant's current counsel had tried to "clawback" the notes on the ground that they had been inadvertently produced.[6] Second, had Grant called his prior counsel this Court would have permitted the government to introduce evidence either through them or otherwise that within three weeks of Bennett's arrest Grant transferred his interest in his home to his wife from whom he had been separated for many years and transferred an apartment in Manhattan to his long-time girlfriend.

Having reviewed all the rulings on this issue and the record of the trial, it is the opinion of this court that on this issue Grant has not raised a substantial question of law, nor has Grant demonstrated that a favorable result on appeal is likely to result in a reversal of his conviction or an order for a new trial.

## Attorney and Accountant Evidence

The second issue upon which Grant predicates his motion for bail pending appeal is also an evidentiary one. As the

---

[6]While there was considerable argument hearing about the intended meaning of the term "inadvertent waiver" in Grant's counsel's January 3, 2007 letter, -- Mar. 18, 2008 Tr. at 29-42 -- even accepting Grant's counsel's reading that the words did not refer generally to production, but only to a possible claim of attorney-client privilege it hardly advances the assertion that the production was the result of a deliberate decision after a specific focus on the notes. If such a focus had taken place, an understanding of the potential privilege should have emerged as every effort would have been made to withhold the notes which on their face do not support Grant's innocence.

15

description of the issue in the course of briefing presents somewhat of a moving target, we will use the heading in the table of contents of Grant's moving memorandum to describe the issue. That heading framed the issue as follows:

> The Court Erred in Excluding Evidence that Highly Respected Lawyers and Accounting Firms Appeared to Have Reviewed and Approved the Fraudulent Transactions

The first level of response to this argument is that it is not founded in fact. To the extent that Grant is contending that "Evidence of Apparent Approval by Lawyers and Accountants Was Circumstantial Evidence Admissible to Disprove Intent and Knowledge" as he states in the heading of his Reply Memorandum at Point IV.A, we never disagreed as the following quotations from the record establish.[7]

> I think it ought to be clear that there has never been any ruling or suggestion that counsel for Mr. Grant can't elicit the fact that law firms, for example, were involved in papering the round trip transactions. If that's something they'd like to elicit, I don't have a problem with that.

\* \* \* \* \*

---

[7] Broadly speaking, the subject matter was initially raised in a pretrial conference on March 18, 2008 at which the Government previewed an issue that it believed could arise with respect to testimony involving Ernst & Young given the defendant's designation of exhibits. While there was discussion on the record, Tr. 51-57, with everyone's concurrence no rulings were made. There was also discussion on the record at the outset of the trial day on March 27, 2008, which concluded with the Court's observation: "Mr. Zuckerman, at this point, I do believe the government has the better argument here....Obviously, you'll ask specific questions and-which will require additional rulings. Okay." Tr. 387.

16

> ...Mr. Grant is...an attorney. He was general counsel to Refco. He worked for a large firm...he understands professionally that there were outside counsel, certainly outside counsel to major companies. I don't know how, in that context, how far the argument that Refco has outside counsel gets anybody, but that's certainly something that Mr. Grant can elicit.

Tr. 922-24.

And with respect to the outside accountants, there was no question that their existence was well-known to the jury, but also that "you [Grant] have been fully allowed to ask him about questions to Arthur Andersen, the auditors." Tr. 496. Grant's counsel was also free to establish that the Refco in-house accounting personnel did not consult with Mr. Grant about how to develop the accounting records of Refco, i.e. how to put the numbers into the books. Tr. 378. In sum, on the broad issue of the existence of lawyers and accountants who "appeared" to have approved the fraudulent transactions, Grant was not precluded in advancing such an argument by the rulings of the Court. Obviously, the viability of the argument was affected by the extensive evidence of the lies that were told to the accountants which undermined their "approval" of the fraudulent transactions.

There was, however, an exchange of letters and on-the-record discussion and ruling on whether Grant could cross-examine the government's cooperating Refco witnesses about whether they made truthful statements to Refco's tax accountants, Ernst &

17

Young. Despite the extended exchange, the parties were essentially in agreement on the correct approach to admissibility. First, there was no dispute that Grant was free to cross-examine the government's witnesses about falsehoods that they had communicated to professional advisers.[8]  Second, the government objected to the admission of truthful statements about the fraud to Ernst & Young unless there was evidence that Grant had communications with Ernst & Young and confirmed whatever false assurances Bennett may have given Grant about Ernst & Young's tax treatment of the accounting irregularities. Transcript of March 18, 2008 Conference at 55-56; Government's letter of March 23, 2008; Tr. at 387; Government's letter of March 31, 2008. However, the defense did not disagree:

> Additionally, it is not accurate that, merely because the government asserts that certain statements made by its witnesses to E&Y were, true, these statements are therefore irrelevant. These transactions may be relevant to Mr. Grant's defense is a number of ways. Should there be evidence connecting those communications and Mr. Grant's state of mind, they could support an argument that Mr. Grant was reassured by the fact that Mr. Bennett and his cohorts had informed a Big 4 accounting firm of certain aspects of Refco's financial transactions that the government now asserts were markers of fraud.

---

[8] "THE COURT: Maybe can we start another way.  What exactly do you want...to establish.
   MR. ZUCKERMAN: Establish the following.  One, the individual on the witness stand lied to Ernst & Young.  It seems to me- -
   THE COURT: I don't think they disagree with that.  So that's no dispute.
   MR. BAROFSKY: No dispute, your Honor."
Tr. 374.

Zuckerman Spaeder letter of March 23, 2008, p. 2 (emphasis added). As the trial developed, the link was never established. Grant did not testify, nor did Bennett or any representative of Ernst & Young. It was on this basis, as well as concern about opening the door to confusing testimony about the differences between tax accounting and audit accounting, which might explain the reason that Refco would make varying disclosures to each and the absence of a link between Ernst & Young's knowledge and Arthur Andersen's, that this Court restricted testimony about truthful disclosures to Ernst & Young. Tr. 922-24.

Finally, the suggestion that Grant was precluded from arguing that counsel appeared to have reviewed and apparently approved the fraudulent transactions is contradicted by the record. The trial record contained evidence of Mayer Brown's role in drafting documents which Grant signed and Grant relied on that evidence in summation. With reference to Refco's contract with Niederhoffer, counsel for Grant stated in summation: "He got a contract that he signed from Refco's lawyer at Mayer, Brown. That's in evidence." (Tr. at 2844). And with respect to the Lee transaction, counsel argued: "Tone Grant figures Lee knows. He sees a couple of lawyers, including the lawyer from

Mayer, Brown, figures this is the deal, is told to sign, and he signs." (Tr. 2857).[9]

The last difficulty with this argument beyond the matters summarized above is that Grant failed to make a record of evidence, by proffer of testimony and/or exhibits, which he now suggests he would have introduced. Early in the trial this Court observed: "Mr. Zuckerman, at this point, I do believe the government has the better argument here.... Obviously, you'll ask specific questions and—which will require additional rulings. Okay." Tr. 387. At no time thereafter was there any suggestion that counsel was precluded from making a record to preserve an argument.

For the foregoing reasons, this court concludes, as it did with the first issue, that this evidentiary argument does not meet the standard required to support an application for bail pending appeal.

## CONCLUSION

For the foregoing reasons, Grant's Motion for Bail Pending Appeal is denied. Furthermore, Grant is directed to surrender to his designated place of confinement before 2 p.m. on October 30, 2008.

---

[9] There was a practical issue here as well, namely, that Joseph Collins, the Refco attorney at Mayer, Brown was himself indicted and was consequently unavailable to testify. Tr. 382-84.

20

**IT IS SO ORDERED.**

DATED:    New York, New York
          October 10, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

21

Copies of the foregoing Order have been faxed and mailed on this date to the following:

<u>Counsel for the Government:</u>
Christopher Garcia, Esq.
Neil Barofsky, Esq.
Assistant United States Attorneys
One Saint Andrew's Plaza
New York, NY 10007

<u>Counsel for defendant Grant:</u>
Roger Zuckerman, Esq.
Aitan Goelman, Esq.
Norman L. Eisenman, Esq.
Zuckerman Spaeder LLP
1800 M Street, N.W.
Washington, DC 20036